**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 1, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2018AP1694-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CF3043

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

VAYLAN G. MORRIS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JANET C. PROTASIEWICZ, Judge. *Judgment affirmed; order reversed and cause remanded*.

Before Brash, P.J., Kessler and Dugan, JJ.

¶1 BRASH, P.J. Vaylan G. Morris appeals his judgment of conviction entered after he pled guilty to second-degree recklessly endangering safety as a party to a crime, and the trial court's order denying his postconviction motion for

resentencing. Morris was charged after the death of his infant daughter, O.M., who had been co-sleeping with Morris and O.M.'s mother, Monica Gonzalez. The cause of O.M.'s death was undetermined, but Morris admitted to smoking synthetic marijuana prior to co-sleeping with O.M. and thought he may have rolled over on her. Additionally, synthetic marijuana was detected in O.M.'s stomach contents, although it was determined not to have caused her death.

¶2 In his postconviction motion, Morris argued that the trial court relied on inaccurate information regarding O.M.'s cause of death. Specifically, the State represented at sentencing that the synthetic marijuana could have been the cause of O.M.'s death; however, the medical examiner had advised the State that the ingested synthetic marijuana was not the cause of death.

¶3 The trial court denied Morris's postconviction motion. It stated that the information presented by the State was not necessarily inaccurate just because it conflicted with the medical examiner's opinion, even though the State conceded that point. The court also stated that it had not relied on the inaccurate information because the sentence imposed was not based on a particular theory of the cause of death, and thus any error relating to that inaccurate information was harmless.

¶4 We disagree. The record demonstrates that after the inaccurate information was presented by the State, the trial court repeatedly referred to Morris and Gonzalez as having caused O.M.'s death during Morris's sentencing hearing. Furthermore, the record does not reflect that the court considered any other possible causes of death. We therefore reverse and remand this matter for resentencing.

**BACKGROUND**

¶5    O.M. was born on October 1, 2015.   On November 25, 2015, Milwaukee police officers and other emergency personnel were dispatched to a residence on North 46th Street in response to a call that O.M. was not breathing. Life-saving measures were unsuccessful, and O.M. was pronounced dead at the scene.

¶6    The responding officers noted that Gonzalez looked as though she was "in a trance"—she had a "blank stare" and was "unsteady on her feet."  She told officers that O.M. had been sleeping in between her and Morris.  Officers then had to wake up Morris, who was still asleep in the bed; officers had to nudge him and call his name several times before he responded.  Morris was unable to answer the officers' questions about O.M., and ultimately admitted that he had been smoking synthetic marijuana.  Gonzalez subsequently admitted that she too had smoked synthetic marijuana prior to going to sleep with O.M. in the bed.  She also told police that Morris had been "so fucked up" after smoking the synthetic marijuana that he had fallen down on the floor.

¶7    Morris was taken into custody, as he was on extended supervision at the time of this incident from a previous criminal conviction and was prohibited from engaging in illegal drug use.  In an interview with police, Morris stated that he believed he had rolled over onto O.M. while they were co-sleeping in the bed.

¶8    An autopsy was conducted on O.M. on November 27, 2015, by Dr. Brian Linert of the Milwaukee County Medical Examiner's Office.  There were detectable levels of synthetic marijuana in O.M.'s stomach contents; liquid residue inside a baby bottle was also tested, and the presence of three types of synthetic marijuana was discovered.  However, the drug had not circulated

through O.M.'s blood stream or nervous system. Dr. Linert therefore concluded that O.M.'s possible ingestion of the drug did not play a role in her death.

¶9 Additionally, the autopsy showed no signs of suffocation, nor any indication that either adult who had been sleeping with O.M. had laid over her body, causing her death. Dr. Linert suggested that co-sleeping could have played a role in O.M.'s death because sudden infant death occurs more frequently in cases of co-sleeping, but "it is not necessarily related to suffocation." Ultimately, Dr. Linert concluded that the cause of O.M.'s death could not be determined.

¶10 Morris was charged in July 2016 with second-degree recklessly endangering safety as a party to a crime. Morris agreed to plead guilty to the charge. Pursuant to the plea negotiations, the State would recommend that Morris serve time in prison, but the length of the term was to be left to the discretion of the trial court.

¶11 The sentencing hearing was held on October 5, 2016. During the hearing, the State discussed the autopsy results, stating that while there were no signs of suffocation, "in cases of overlay, there are often no signs that a child has been suffocated." The trial court then inquired how else O.M. would have died; the State responded, "[t]he synthetic marijuana in the child's system[.]" The State continued, "[s]o we know that this child had three different types of synthetic marijuana in her system, *but we don't know exactly how far the synthetic marijuana made it inside her system in order to say that that was the ultimate cause of her collapse and death*." (Emphasis added.)

¶12 Throughout the remainder of Morris's sentencing hearing, the trial court made several references to O.M.'s cause of death. The court called it "not a tragedy" but "a horrible, horrible, completely preventable situation," noting that

4

O.M. "would be alive and well today if you and her mother had not engaged in the reckless criminal conduct the two of you chose to engage in." The court noted that Morris had stated he believed he had rolled over on O.M., and then further observed:

> [a]nd then we've got all this synthetic marijuana in [O.M.'s] system. So not only could you have suffocated her—you certainly had been negligent enough. And I hope it was negligence. I hope the two of you weren't putting anything in her bottle to make her sleep soundly so she wouldn't bother you. But that certainly comes to mind.

¶13 Additionally, in response to Morris's request for probation so that he would be able to properly grieve for O.M. and "pay respects to her grave," the trial court stated, "[y]ou want to visit her grave. You know, [the] two of you killed her. I don't even know how you think you have the right to do that and continue to grieve." The court also referred to O.M.'s death as a "completely prevent[a]ble tragedy that the two of you caused." Ultimately, the trial court imposed a nine-year sentence on Morris, bifurcated as four years of initial confinement and five years of extended supervision.

¶14 Morris filed a postconviction motion in May 2018 seeking a new sentencing hearing. He argued that the trial court relied on inaccurate information at sentencing; specifically, the State's misstatements about O.M.'s cause of death being related to the synthetic marijuana found in her system. Morris contended that the court's remarks during the sentencing hearing demonstrated its reliance on the State's inaccurate statements. Morris further asserted that the State would not be able to prove that this error was harmless due to the court's "particular interest in this information" at sentencing.

¶15    In its response, the State conceded that this information conveyed to the trial court at sentencing was inaccurate.  However, it "strongly contest[ed]" Dr. Linert's statements in his affidavit that he had informed the State that the synthetic marijuana had not circulated through O.M.'s system prior to her death.  Furthermore, the State asserted that the error was harmless because "the inaccurate information did not change the ultimate likelihood that [Morris] caused the death of O[.]M."

¶16    The trial court denied the motion.  It stated that while the State "misquoted *Dr. Linert's* conclusion" regarding the role of synthetic marijuana in O.M.'s death, "it was not necessarily inaccurate" because "[d]ifferent medical examiners can disagree about the cause of death."  (Alteration in original.)  The court further held that Morris had not demonstrated that the court had relied on the inaccurate information because the court "did not rely upon any particular theory of the cause of death," but rather had imposed the sentence to "punish[] [Morris] for his *reckless behavior*."  (Alteration in original.)  The court declared that "[e]ven if [O.M.]'s death could be attributed to some other factor, it doesn't change the incredibly poor parenting and reckless behavior [Morris] showed towards his child," and therefore the inaccurate information presented by the State was "truly harmless."  This appeal follows.

## DISCUSSION

¶17    We first address the State's argument that Morris forfeited his right to make this claim because his trial counsel did not object to the presentation of the inaccurate information during the sentencing hearing.  Morris points out that his trial counsel had no way of knowing that the information was inaccurate at the time of sentencing, because the State had represented that the prosecutor obtained

6

the information during a discussion with Dr. Linert, and Morris's trial counsel was not present for that conversation.

¶18    It is within the discretion of an appellate court "to disregard alleged forfeiture and consider the merits of any issue because the rule of forfeiture is one of judicial administration and not of power." *State v. Wilson*, 2017 WI 63, ¶51 n.7, 376 Wis. 2d 92, 896 N.W.2d 682.  To the extent forfeiture may apply in this case, we elect to disregard the alleged forfeiture and consider Morris's claim on the merits.[1]

¶19    Turning to that claim, defendants have "a constitutionally protected due process right to be sentenced upon accurate information." *State v. Tiepelman*, 2006 WI 66, ¶9, 291 Wis. 2d 179, 717 N.W.2d 1.  A defendant seeking resentencing based on inaccurate information at sentencing "must show both that the information was inaccurate and that the court actually relied on the inaccurate information in the sentencing."  *Id.*, ¶26 (citations and some quotation marks omitted).  Whether a defendant has been denied this right is a constitutional issue that we review *de novo*. *Id.*, ¶9.

¶20    In denying Morris's postconviction motion, the trial court held that he had not proven either prong of the *Tiepelman* test.  First, with regard to the inaccurate information relating to whether the synthetic marijuana was the cause of O.M.'s death, the court stated that the information "was not necessarily

---

[1] The State contends that because Morris forfeited the right to bring his claim on appeal, it should instead have been framed as an ineffective assistance of counsel claim.  Because we reject the State's forfeiture argument, we do not reach an ineffective assistance analysis.

inaccurate" because "[d]ifferent medical examiners can disagree about the cause of death."

¶21 However, in this case, Dr. Linert submitted an affidavit in support of Morris's postconviction motion stating that "within a degree of medical certainty" the synthetic marijuana ingested by O.M. was not a cause of her death. There was no other report or opinion submitted by any other medical examiner or other expert advancing a different conclusion. Therefore, the trial court's inference that a different medical examiner would have come to a different conclusion regarding cause of death is inconsistent with, and unsupported by, the record.

¶22 Moreover, the State conceded in its response to Morris's postconviction motion that the information presented at sentencing regarding the synthetic marijuana as O.M.'s cause of death was inaccurate. Accordingly, Morris met the first prong of the *Tiepelman* test.

¶23 The trial court also found that Morris had not proven the second prong of the *Tiepelman* test—proving actual reliance on the inaccurate information. The court acknowledged that it had inquired about O.M.'s cause of death during the sentencing hearing, but maintained that it had not relied upon "any particular theory of the cause of death" in imposing sentence on Morris. The court opined that Morris had "read[] too much into the court's sentencing remarks."

¶24 The trial court's remarks, however, clearly indicate its belief that Morris caused the death of O.M. Furthermore, those remarks were made *after* the court inquired as to the cause of O.M.'s death, at which point the State presented the inaccurate information regarding the possibility that the ingested synthetic marijuana had been the cause of death. Therefore, we conclude that Morris has

met his burden of showing that the court relied on that inaccurate information at sentencing.

¶25 If a defendant proves actual reliance on inaccurate information, "the burden then shifts to the [S]tate to prove the error was harmless." *Id.*, ¶26. "'An error is harmless if there is no reasonable probability that it contributed to the outcome.'" *State v. Payette*, 2008 WI App 106, ¶46, 313 Wis. 2d 39, 756 N.W.2d 423 (citation omitted).

¶26 The trial court found that the error was harmless because Morris had admitted to the reckless behavior that had endangered O.M.'s safety—smoking synthetic marijuana prior to co-sleeping with her. The court acknowledged that the State had conceded that it presented inaccurate information, but also referenced the State's argument that "the only reason [the synthetic marijuana] would not have circulated in [O.M.]'s system is if something else had caused her death first, and that 'something else' … is the 'very real likelihood' that [Morris] suffocated her while co-sleeping." The court then stated that "[e]ven if [O.M.]'s death could be attributed to some other factor, it doesn't change the incredibly poor parenting and reckless behavior [Morris] showed towards his child," and therefore the error was "truly harmless."

¶27 On the contrary, that statement by the trial court indicates that the error was *not* harmless. In phrasing its conclusion "[e]*ven if* [O.M.]'s death *could be attributed* to some other factor," the court is clearly communicating its belief that Morris caused O.M.'s death. (Emphasis added.) The record demonstrates that the court never considered any other possible cause of death, such as sudden infant death syndrome. Moreover, the court's statements conflict with the autopsy findings, which stated that a cause of death could not be determined.

¶28 Therefore, we conclude that there is a reasonable probability that the inaccurate information presented by the State regarding O.M.'s cause of death contributed to the sentence imposed on Morris by the trial court. As a result, the error was not harmless. *See id.*, ¶46. Accordingly, we reverse and remand this matter for resentencing.

*By the Court.*—Judgment affirmed; order reversed and cause remanded.

Not recommended for publication in the official reports.